IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BECKLEY DIVISION

CONNIE SUE HOWERTON,

  Plaintiff,

v.          **Case No.: 5:18-cv-01462**

ANDREW M. SAUL,
Commissioner of the
Social Security Administration,[1]

  Defendant.

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable Irene C. Berger, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' briefs wherein they both request judgment in their favor. (ECF Nos. 11, 12).

---

[1] Pursuant to 42 U.S.C. § 405(g) and Rule 25(d) of the Federal Rules of Civil Procedure, the current Commissioner of the Social Security Administration, Andrew M. Saul, is substituted for former Commissioner, Nancy A. Berryhill, as Defendant in this action.

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's motion for judgment on the pleadings be **GRANTED**, to the extent that it requests remand of the Commissioner's decision, (ECF No. 11); that the Commissioner's motion for judgment on the pleadings be **DENIED**, (ECF No. 12); that the decision of the Commissioner be **REVERSED**; that this case be **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g); and that this case be **DISMISSED**, **with prejudice,** and removed from the docket of the Court.

## I.    <u>Procedural History</u>

On January 7, 2010, Plaintiff Connie Sue Howerton ("Claimant") protectively filed an application for DIB, alleging a disability onset date of July 17, 2006 due to rheumatic heart disease, rheumatoid arthritis, a brain tumor, "nerves," fibromyalgia, and headaches. (Tr. at 328-34, 382). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 99, 126-30). Claimant subsequently filed a request for an administrative hearing. (Tr. at 145-46). An initial and two supplemental hearings were held on November 15, 2011; May 30, 2012; and September 11, 2012, respectively, before the Honorable Robert S. Habermann, Administrative Law Judge ("ALJ Habermann"). (Tr. at 33-60, 61-74, 91-97). During the third hearing, Claimant orally moved to amend her alleged onset date to September 28, 2009. (Tr. at 96). ALJ Habermann issued a decision on September 17, 2012, which determined that Claimant was not disabled as defined in the Social Security Act. (Tr. at 100-20).

However, the Appeals Council remanded the case, directing the ALJ to resolve the following issues: (1) determine whether Claimant was disabled from the amended

onset date of September 29, 2009[2] through December 31, 2010 (as opposed to December 31, 2009, which ALJ Habermann incorrectly considered to be the date last insured); (2) obtain evidence from a medical expert to clarify the nature and severity of Claimant's impairments, if necessary; (3) give further consideration to Claimant's RFC and provide rationale and citations to the record to support the assessed limitations; and (4) obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on Claimant's occupational base. (Tr. at 122-23).

Therefore, a fourth administrative hearing was held on August 11, 2014 before the Honorable William Paxton, Administrative Law Judge ("the ALJ"). (Tr. at 75-97). By written decision dated August 28, 2014, the ALJ likewise found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 10-32). After the Appeals Council denied Claimant's request for review, Claimant filed a civil action, seeking judicial review pursuant to 42 U.S.C. § 405(g). (Tr. at 1-6); *Howerton v. Colvin*, No. 5:16-CV-01026, 2016 WL 7646365, at *1 (S.D.W. Va. Dec. 12, 2016), *report and recommendation adopted,* 2017 WL 55873 (S.D.W. Va. Jan. 4, 2017). This Court remanded the Commissioner's decision based on new evidence that was submitted to the Appeals Council. The evidence, which consisted of treatment records and test results from Claimant's cardiologist, Jebran Karam, M.D., FACC, during the relevant period, undermined the ALJ's conclusions that Claimant had largely benign cardiac findings, did not seek specialized cardiac treatment, and was treated conservatively. Given that the new evidence had a potential impact on the ALJ's credibility finding,

---

[2] As stated, Claimant amended her alleged onset date to September 28, 2009. (Tr. at 96). However, in its Order, the Appeals Council misstated the date to be September 29, 2009, and the ALJ has used the amended alleged onset date of September 29, 2009 in his decisions. (Tr. at 15, 123, 953). Claimant has not challenged the ALJ's use of September 29, 2009 as the alleged onset date.

RFC determination, and ultimate disability decision, the Court remanded the matter for the ALJ to consider the additional evidence from Dr. Karam and reconcile any conflicts between such evidence and the ALJ's findings.

On remand, the ALJ held another administrative hearing on October 23, 2017. (Tr. at 971-85). Thereafter, on January 31, 2018, the ALJ issued a decision finding that Claimant was not disabled as defined in the Social Security Act. (Tr. at 947-70). The ALJ's decision became the final decision of the Commissioner on September 24, 2018 when the Appeals Council denied Claimant's request for review. (Tr. at 941-46). Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 7, 8). Thereafter, Claimant filed a Brief in Support of Judgment on the Pleadings, (ECF No. 11), and the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 12), to which Claimant filed a reply. (ECF No. 15). Consequently, the matter is fully briefed and ready for resolution.

## II.   **Claimant's Background**

Claimant was 44 years old on her alleged disability onset date and 46 years old on her date last insured. (Tr. at 251). She communicates in English and completed the twelfth grade. (Tr. at 381, 383). Claimant previously worked as a manager at a fast food restaurant and a manager at a restaurant/convenience store. (Tr. at 384).

## III.   **Summary of the ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful

activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's

remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at every level in the administrative review," including the review performed by the ALJ. 20 C.F.R. § 404.1520a. First, the ALJ evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 404.1520a(b). If such impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment

meets or is equal to a listed mental disorder. *Id.* § 404.1520a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual function. *Id.* § 404.1520a(d)(3).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status requirements for disability insurance benefits through December 31, 2010. (Tr. at 952, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since September 29, 2009, her amended alleged disability onset date, through her date last insured. (Tr. at 953, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "rheumatic mitral valve disease, status post valvuloplasty; coronary artery disease, status post stenting; fibromyalgia; and anxiety disorder." (*Id.*, Finding No. 3). The ALJ considered and found non-severe Claimant's right wrist pain, asthma, headaches, osteoarthritis in her left knee, hypertension, and hyperlipidemia. (Tr. at 953). He also considered Claimant's IQ test results, but concluded that Claimant did not have a cognitive or intellectual disorder that was a medically determinable impairment. (*Id.*).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 953-55, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except never perform climbing of ladders, ropes, or scaffolds. The claimant could occasionally perform balancing, kneeling, stooping, crouching, crawling, and climbing of ramps and stairs. She must avoid concentrated exposure to extreme cold, extreme

heat, vibration, fumes, odors, dusts, gases, poor ventilation and all exposure to hazards, such as heights and machinery. The claimant is limited to performing routine, repetitive, tasks; understanding, remembering, and carrying out simple instructions; performing work without specific production quotas or a rapid pace; and interacting only occasionally with the public.

(Tr. at 955-60, Finding No. 5). At the fourth step, the ALJ found that through the date last insured, Claimant was unable to perform her past relevant work as a hostess and assistant manager. (Tr. at 960, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with her RFC to determine her ability to engage in substantial gainful activity. (Tr. at 960-61, Finding Nos. 7-10). The ALJ considered that (1) Claimant was defined as a younger individual aged 18-49 on her date last insured; (2) she had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the disability determination. (Tr. at 960, Finding Nos. 7-9). Given these factors and Claimant's RFC, with the assistance of a vocational expert, the ALJ concluded that Claimant could perform jobs that existed in significant numbers in the national economy. (Tr. at 960-61, Finding No. 10). At the sedentary exertional level, Claimant could perform unskilled work as an addresser, order clerk, and assembler. (Tr. at 961). Therefore, the ALJ found that Claimant was not disabled as defined in the Social Security Act and was not entitled to benefits. (Tr. at 961, Finding No. 11).

## IV.    **Claimant's Challenges to the Commissioner's Decision**

Claimant raises a single challenge to the Commissioner's decision, asserting that the ALJ failed to properly consider whether Claimant met Listing 4.04 – Ischemic Heart Disease. (ECF No. 11). In particular, Claimant contends that the ALJ's "brief, two-sentence" step three finding did not indicate what medical evidence the ALJ

considered, nor did it "provide any useful information as to why," the ALJ concluded that Claimant did not meet section C of that listing, Listing 4.04C – Coronary Artery Disease. According to Claimant, the record contained evidence that Claimant met Listing 4.04C, yet the ALJ failed to discuss it. Claimant further argues that the ALJ did not consider whether her cardiac conditions in combination with her fibromyalgia could equal Listing 4.04. Finally, Claimant argues that the ALJ did not comply with SSR 83-20 to determine if she met Listing 4.04C before her date last insured. Claimant notes that the state agency physician, Lee T. Besen, M.D., concluded that Claimant met Listing 4.04C in 2012, and the ALJ rejected the opinion on the basis that it related to the period after Claimant's date last insured on December 30, 2010. However, Claimant points out that Dr. Besen did not have the benefit of reviewing the pre-December 2010 evidence from Dr. Karam because such evidence was not added to the record until the case reached the Appeals Council. Claimant contends that, given the fact that the case was specifically remanded for the ALJ to consider the new evidence from Dr. Karam, the ALJ should have obtained an updated opinion from Dr. Besen or another expert that considered Dr. Karam's records. Claimant argues that an expert could reasonably have concluded based on the new evidence that Claimant met Listing 4.04C during the relevant period.

In response to Claimant's arguments, the Commissioner asserts that this case was remanded for the ALJ to consider Dr. Karam's additional records, and the ALJ complied with that directive. (ECF No. 12). The Commissioner posits that Claimant simply takes issue with the format of the ALJ's decision, asserting that the ALJ should have included discussion from another section of his decision in the step three analysis. (*Id.* at 2). According to the Commissioner, the ALJ provided specific reasons at step

three to explain why Claimant did not meet Listing 4.04, and he discussed the substantial evidence supporting that determination in the remainder of his decision. (*Id.* at 9). The Commissioner also argues that Claimant fails to explain how her complaints of "non-cardiac, possibly fibromyalgia-related chest pain" satisfied Listing 4.04. (*Id.* at 11). Moreover, the Commissioner notes that SSR 83-20 applies only when a claimant is found disabled; thus, the Commissioner argues that the ruling is of no consequence to the present matter. (*Id.* at 12).

**V.    Relevant Medical History**

The undersigned has reviewed all of the evidence before the Court. The medical records and opinion evidence most relevant to these Proposed Findings & Recommendations are summarized as follows.

**A. Treatment Records**

Claimant has a history of coronary artery disease and mitral stenosis due to rheumatic heart disease, which preceded and continued throughout her alleged period of disability. (Tr. at 490, 492, 661, 677, 939). In 2000, Claimant underwent cardiac catheterization, with stents placed in her right coronary artery. (*Id.*). Subsequently, in 2002, she had a mitral valvuloplasty, which was reportedly successful in improving her mitral valve area to 2.4 to 2.8 squared centimeters. (Tr. at 939).

On August 27, 2009, Claimant presented as a new patient to Access Health Rural Acres. (Tr. at 583). She was examined by Kimberly D. Ballard, D.O. (*Id.*). Claimant was not experiencing any symptoms, did not report any chronic pain, and had no current complaints. (*Id.*). Rather, Claimant stated that she wanted to establish care and needed refills of her medications. (*Id.*). She had no chest pain or palpitations. (Tr. at 584). Her cardiovascular examination revealed regular heart rate and rhythm

without murmur, as well as normal carotid arterial and pedal pulses without bruits. (*Id*). She was assessed with hypertension and rheumatic heart disease. (Tr. at 585). Dr. Ballard recommended that Claimant establish care with a local cardiologist. Claimant agreed to consider the recommendation, but declined to do so at that time due to cost. (*Id.*).

On September 28, 2009, Claimant presented for an office visit at Access Health Rural Acres complaining of dizziness. (Tr. at 580). She saw Amy Brown, D.O. (*Id.*). Claimant denied heart palpitations, and her cardiovascular examination revealed regular heart rate and rhythm without murmur. Her peripheral circulation showed no edema. (Tr. at 581-82). Claimant's hypertension was improved, and her rheumatic heart disease appeared to be stable. (Tr. at 582). She was referred to cardiology for a consultation. (*Id.*).

On January 12, 2010, Claimant presented for another office visit at Access Health Rural Acres complaining of "problems with nerves." (Tr. at 576). She saw Tiffany K. Thymius, D.O. (*Id.*). Claimant's blood pressure was 124/78 and the only pain that she reported was in her right wrist. (*Id.*). She denied having any heart palpitations and her cardiovascular examination revealed regular heart rate and rhythm without murmur, normal carotid arterial and pedal pulses without bruits, and her peripheral circulation showed no edema. (Tr. at 577-78). She received refills for Lipitor, Plavix, and Toprol. (Tr. at 579).

On February 18, 2010, Claimant presented for an initial cardiac consultation with Dr. Karam at Raleigh Cardiology Clinic. (Tr. at 938). Dr. Karam noted that Claimant had a history of coronary artery disease with prior cardiac catheterization and a stent placed in her mid-right coronary artery. (*Id.*). He also noted that Claimant

had a history of severe mitral stenosis. She was treated with a balloon valvuloplasty, after which Claimant initially felt better, but reported that her symptoms gradually began worsening. (*Id.*). Dr. Karam stated that over the previous year, Claimant experienced dyspnea with mild exertion and had exertional heaviness and tightness that was relieved by rest. (*Id.*). Claimant also reported being very tired and having occasional skipped heart beats, but denied orthopnea or paroxysmal nocturnal dyspnea, dizziness, or syncope. (*Id.*).

Dr. Karam diagnosed Claimant with coronary artery disease, status post stenting, rule out progression; severe mitral stenosis due to rheumatic heart disease, status post successful balloon valvuloplasty in 2002, rule out progression; history of mild to moderate aortic regurgitation, rule out progression; history of moderate pulmonary hypertension, rule out progression; and history of hypertension, rule out left ventricular hypertrophy. (Tr. at 939). He ordered a thoracic echocardiogram and decided to obtain Claimant's laboratory results from Access Health Rural Acres. (Tr. at 939-40). Dr. Karam indicated that he was very concerned about Claimant's presentation and felt that she may have significant progression of her coronary artery disease and valvular disease. (*Id.*). He did not feel comfortable referring Claimant for a stress test. (*Id.*). He increased her medications and urged her to avoid exertion and to go to the emergency room if she experienced worsening symptoms. (*Id.*). Dr. Karam stated that he would review her echocardiogram results, but felt that Claimant would most likely require catheterization. Claimant expressed great hesitation due to the financial burden of the procedure, as she lacked insurance coverage. (*Id.*). Dr. Karam urged Claimant to cease smoking, explaining that with her age and cardiac risk factors, continued smoking would place Claimant at a significantly increased risk of acute

coronary syndrome, sudden cardiac stroke, and death. (*Id*.).

On March 17, 2010, Claimant underwent the echocardiogram study ordered by Dr. Karam. (Tr. at 936). Dr. Karam interpreted the study to show aortic sclerosis without stenosis; mildly dilated right and left atria; normal right ventricular size and function with mild pulmonary hypertension; normal left ventricular size with ejection fraction of 60 percent with evidence of left ventricular dystolic dysfunction; small pericardial effusion; mild to moderate II/IV aortic regurgitation; at least moderate mitral stenosis with mild regurgitation; mild tricuspid regurgitation; and mild pulmonary regurgitation. (Tr. at 937). Because the study was technically limited in assessing the mitral valve, Dr. Karam suggested a transesophageal echocardiogram ("TEE") to fully determine the degree of mitral valve disease.

On April 6, 2010, Claimant presented to Dr. Karam for a follow-up appointment. (Tr. at 933). She had no new cardiac problems. (*Id*.). Claimant had baseline dyspnea on exertion that was unchanged; no chest pain or tightness on exertion since her prior visit; and no orthopnea, paroxysmal nocturnal dyspnea, dizziness, syncope, or focal weakness or numbness. (*Id*.). Claimant believed that her blood pressure and "labs" were well controlled. (*Id*.). Claimant's blood pressure was 132/76. (Tr. at 934). Dr. Karam planned to rule out progression of Claimant's coronary artery disease. (Tr. at 934). He opined that her mitral valve disease was becoming "very significant" and probably required further intervention, but to confirm, he would refer her for a TEE, which would allow him to better evaluate her mitral and aortic valves. (*Id*.). Dr. Karam felt, depending on the TEE results, that Claimant might require a right and left catheterization. (*Id*.). Dr. Karam noted that Claimant was very concerned about the financial cost of the procedure, as she was denied Medicaid and was still pursuing

benefits through the SSA. (Tr. at 934-35). Claimant was to follow up with Dr. Karam in three months or "much earlier" if she elected to have the procedure or obtained insurance. (*Id.*).

On May 11, 2010, Claimant underwent a left ventriculography and intravascular ultrasound-guided cardiac catheterization performed by Elie Gharib, M.D. (Tr. at 638). Dr. Gharib documented that he placed two stents, one in the circumflex artery and one in the diagonal 1 branch of the left anterior descending ("LAD") artery. Dr. Gharib found diffuse 30%-40% stenosis in the LAD, with 60%-70% proximal stenosis in the diagonal 1 branch. He also found 30%-40% diffuse stenosis in the first obtuse marginal branch and ostial, with 66% stenosis in the circumflex artery. (Tr. at 639). Claimant had normal left ventricular function with ejection fraction estimated at 70 percent with normal wall motion. (*Id.*). Dr. Gharib recommended aggressive medical management and risk factor modification, as well as the use of Plavix and aspirin. (*Id.*). He suggested that other causes for Claimant's chest pain be explored, as she complained of constant pain that did not resolve during pre and post-operative percutaneous coronary intervention (PCI). The x-rays of her chest showed no signs of acute infiltrates or signs of failure. (Tr. at 665).

On May 18, 2010, Claimant presented to Access Health Rural Acres, requesting a referral to a neurologist stating that she was experiencing headaches and had been diagnosed with a brain tumor three years earlier. (Tr. at 655). Claimant could not recall who diagnosed her with a brain tumor or where she had her prior brain scan performed. (*Id.*). Claimant reported that she felt "OK" since her stent surgery, but she continued to smoke. (*Id.*). Her cardiovascular examination demonstrated regular heart rate and rhythm without murmur, normal carotid arterial and pedal pulses without

14

bruits, and her peripheral circulation showed no edema. (Tr. at 656). Her hypertension and rheumatic heart disease were stable. (*Id.*). An MRI was ordered, and she was referred to neurology. (*Id.*).

On July 1, 2010, Claimant presented to Access Health Rural Acres with bilateral leg pain that she described as constant cramping pressure. (Tr. at 651). She discussed starting Chantix. (*Id.*). Her cardiovascular examination demonstrated regular heart rate and rhythm without murmur, normal carotid arterial and pedal pulses without bruits, and her peripheral circulation showed no edema. (Tr. at 652-53). Her hypertension was listed as stable, but her other chronic cardiovascular conditions were not noted on her assessment at this visit. (Tr. at 653).

On August 11, 2010, Claimant presented to Dr. Karam for evaluation of chest pain following her stenting procedure. (Tr. at 930). Dr. Karam noted that he last saw Claimant in the Spring when Claimant contacted him and stated that she was able to go forward with the cardiac catheterization because she believed that her insurance company would cover 70 percent of the cost. (*Id.*). Claimant reported to Dr. Karam that she continued to experience chest pain, which she described as sharp, stabbing pain that lasted for hours without spontaneous resolution and which was not necessarily precipitated by emotional or physical stress. (*Id.*). Claimant stated that her dyspnea had significantly improved following the stenting procedure, but she admitted that she continued to smoke. (*Id.*). She denied any midsternal heaviness, tightness, orthopnea, paroxysmal nocturnal dyspnea, dizziness, or syncope. (*Id.*). On examination, Claimant's blood pressure was 122/74, her arterial pulses were normal, and her jugular veins showed no distention or abnormal waves. (Tr. at 931).

Dr. Karam's impression was that Claimant had coronary artery disease, status post stenting and catheterization. (*Id*.). He noted that Claimant's prior procedures revealed a normal left main artery, 30 to 40 percent stenosis in the left anterior descending artery, 70 percent stenosis in the diagonal branch, 66 percent stenosis in the marginal artery, with nonobstructive disease in the right coronary artery. (*Id*.). Dr. Karam further noted that drug eluting stents were placed in the diagonal and marginal arteries. Claimant had stable angina and her chest pain was atypical and not believed to be cardiac in etiology. (*Id*.). Dr. Karam planned to rule out progression of Claimant's moderate, if not severe, mitral stenosis due to rheumatic heart disease; mild to moderate II/IV aortic regurgitation; and mild tricuspid regurgitation. (*Id*.)

Claimant underwent an EKG, which was normal. (Tr. at 932). Based on that finding, Dr. Karam recommended cardiac risk modification, including compliance with diet, medications, exercise, and smoking cessation. (*Id*.). He also advised Claimant to follow up with her primary care provider to ensure continuous medical care and routine laboratory work in view of possible side effects from her prescribed medication. Dr. Karam suggested that Claimant discuss her chest pain with her family physician for noncardiac workup, as the pain could be related to her fibromyalgia. (*Id*.).

On August 11, 2010, Dr. Karam summarized in a letter to Claimant's primary care physician the findings and recommendations from his consultative cardiac evaluation of Claimant. (Tr. at 661). He noted that Claimant's chronic problems included, *inter alia,* coronary artery disease, status post stenting, with stable angina; severe mitral stenosis due to rheumatic heart disease, rule out progression; mild to moderate II/IV aortic regurgitation, rule out progression; mild tricuspid regurgitation with mild pulmonary hypertension, rule out progression; continuous tobacco abuse

16

with dyspnea; and hypertension with left ventricular hypertrophy. (*Id.*). He further noted that Claimant's EKG was normal with no significant changes. (Tr. at 661). However, Dr. Karam stated that he had wanted to do a TEE to assess Claimant's mitral valve disease, but because she had received drug eluting stents during her recent catheterization, he could not do an invasive intervention at that time. Based on her current studies, Dr. Karam decided to wait and reevaluate the status of Claimant's mitral valve disease in March 2011. Dr. Karam also indicated that Claimant was advised to discuss her chest pain with her primary provider for "noncardiac workup," as it was believed not to be cardiac in etiology and could be related to her fibromyalgia. (*Id.*). Claimant was instructed to stop smoking and was advised of the importance of maintaining proper blood pressure and lipid profile. (*Id.*).

Shortly after Claimant's date last insured, on February 2, 2011, Claimant had a routine follow-up office visit at Access Health Rural Acres. (Tr. at 647-48). Claimant was tolerating her medications "OK" without side effects and her chronic problems were stable without any new changes. (Tr. at 648). She denied heart palpitations, chest pain, or shortness of breath. (*Id.*). Her cardiovascular examination demonstrated regular heart rate and rhythm without murmur, normal carotid arterial and pedal pulses without bruits, and her peripheral circulation showed no edema. (Tr. at 649). Claimant received refill prescriptions for her "chronic maintenance medications" and was instructed to obtain the diagnostic studies that were ordered and return to the clinic in four months. (*Id.*).

Thereafter, on April 13, 2012, Claimant presented to the emergency room at Charleston Area Medical Center with intermittent chest pain beginning that day, which varied from dull to the most severe pain and happened during rest. (Tr. at 757, 762).

Her cardiac enzymes were abnormal. (*Id.*). She had stenosis of 77 percent in her LAD, 70 percent in her circumflex artery with 72 percent stenosis at its mid-segment, and 70 percent in the ostial segment of the obtuse marginal 1 branch. (Tr. at 822). She had normal left ventricular systolic function. (*Id.*). She underwent successful cardiac catheterization with IVUS-guided stenting to the LAD, first diagonal branch, circumflex, and obtuse marginal branch with drug-eluting stents. (Tr. at 757). There was no residual stenosis. (Tr. at 822). Claimant had eight stents placed in total. (Tr. at 832).

### B. Evaluation and Opinion Evidence

On March 22, 2010, Atiya M. Lateef, M.D., completed a physical RFC assessment form. (Tr. at 590). Dr. Lateef opined that Claimant could perform work at the light exertional level with additional postural and environmental limitations. (Tr. at 592, 594).

On September 6, 2011, Gary Craft, M.D., performed a consultative examination of Claimant for the West Virginia Disability Determination Service. (Tr. at 625). Claimant's blood pressure was recorded to be 160/102, but her heart had normal rhythm and was free of gallop, murmur, click, or irregularity. (Tr. at 626-27). Dr. Craft noted that auscultation of the heart was negative, and he could not detect any peripheral arterial disease. (Tr. at 627). His long-term prognosis for Claimant's cardiovascular system was "fair." (*Id.*). As far as her ability to do work-related activities, Dr. Craft opined that Claimant was capable of frequently lifting and carrying up to 10 pounds, occasionally lifting and carrying up to 50 pounds, but never carrying over 50 pounds. (Tr. at 631). Claimant could sit for four hours, stand for three hours, and walk for two hours without interruption and she could sit for a total of 7 hours,

18

stand for 6 hours, and walk for five hours in an 8-hour workday. (Tr. at 632). Claimant could continuously use her hands for all activities except that she could only frequently reach overhead and she could only frequently use her feet to operate foot controls. (Tr. at 633). Claimant also had some environmental and postural limitations. (Tr. at 634-35).

On January 24, 2012, Lee T. Besen, M.D., reviewed some of Claimant's medical records and provided an opinion letter to ALJ Habermann, noting that Claimant's cardiovascular disease was stable after the placement of two coronary stents in 2010 and prosthetic heart valve surgery in 2000. (Tr. at 718). Dr. Besen stated that there were no cardiac symptoms addressed in the data and opined that Claimant did not meet or equal any impairments in the Listing and did not have any functional limitations. (*Id*.). Dr. Besen opined that Claimant could frequently lift and/or carry up to 20 pounds, occasionally lift and/or carry up to 50 pounds, and never lift over 50 pounds. (Tr. at 719). At one time without interruption, she could sit for two hours and stand and/or walk for one hour. (Tr. at 720). She could sit for six hours and stand or walk for two hours in an 8-hour workday. (*Id*.). She could frequently use her hands and feet and had other postural and environmental limitations. (Tr. at 721-23).

On August 27, 2012, Dr. Besen provided an updated opinion based on additional medical records. Dr. Besen noted that Claimant required cardiac stents in 2000, 2010, and 2012. (Tr. at 865). Dr. Besen stated that it was apparent that Claimant had recurrent cardiovascular disease, most recently in 2012. (*Id*.). He concluded that, based on the additional records, Claimant met Listing 4.04C, and the onset date appeared to be 2012. (*Id*.).

## VI.    <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable Regulations and Rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.    <u>Discussion</u>

Claimant's challenge to the Commissioner's decision concerns the ALJ's step three analysis and finding that Claimant did not satisfy Listing 4.04. Claimant contends that the ALJ did not provide any substantive explanation as to why Claimant did not satisfy Listing 4.04C – Coronary Artery Disease, although there was evidence in the record that Claimant met the listing criteria. Claimant argues that the ALJ failed to discuss the critical conflicting evidence in the step three analysis or at any other

point in the decision. Moreover, Claimant points out that the ALJ did not obtain an updated medial opinion from Dr. Besen or another expert on remand, even though Dr. Besen previously concluded that Claimant met Listing 4.04C beginning in 2012 based on the evidence he reviewed at that time. Claimant reasons that Dr. Besen or another expert could reasonably have concluded that Claimant met Listing 4.04C during the relevant period in 2009 and 2010, if Dr. Besen had been privy to the additional evidence from Dr. Karam.

### A. Listing 4.04C

A claimant should be found disabled at step three of the sequential evaluation process when his or her impairments meet or medically equal an impairment included in the Listing in Appendix 1 of 20 C.F.R. Part 404, Subpart P. *See* 20 C.F.R. § 404.1520(a)(4)(iii). The Listing describes "for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity." *See* 20 C.F.R. § 404.1525. The Listing is intended to identify those individuals whose mental or physical impairments are so severe that they would be found disabled regardless of their vocational background; consequently, the criteria defining the listed impairments are set at a higher level of severity than that required to meet the statutory definition of disability. *Sullivan v. Zebley,* 493 U.S. 521, 532, (1990). Because the listed impairments presume disability, "[f]or a claimant to show that his impairment matches a [listed impairment], it must meet *all* of the specified medical criteria." *Id.* at 530. The claimant bears the burden of production and proof at this step of the disability determination process. *Grant v. Schweiker,* 699 F.2d 189, 191 (4th Cir. 1983).

In the Fourth Circuit, "where there is factual support that a listing could be met,"

the ALJ must consider whether the claimant's impairment meets or equals the relevant listing. *Huntington v. Apfel*, 101 F. Supp. 2d 384, 390 (D. Md. 2000) (citing *Cook v. Heckler,* 783 F.2d 1168, 1172 (4th Cir. 1986)). "The ALJ's analysis must reflect a comparison of the symptoms, signs, and laboratory findings concerning the impairment, including any resulting functional limitations, with the corresponding criteria set forth in the relevant listing." *Id.* at 390-91; *see also Ezzell v. Berryhill*, 688 F. Appx. 199, 200 (4th Cir. 2017) ("When there is 'ample evidence in the record to support a determination' that the claimant's impairment meets or equals one of the listed impairments, the ALJ must identify 'the relevant listed impairments' and compare 'each of the listed criteria to the evidence of the claimant's symptoms.'") (citing *Cook*, 783 F.2d at 1172-73) (internal markings omitted).

As is the case throughout the sequential evaluation process, the ALJ must set forth the reasons for the step three determination. *See, e.g.*, *Radford v. Colvin*, 734 F. 3d 288, 295 (4th Cir. 2013) ("A necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling.") (citing *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984)). An ALJ's explanation is insufficient if it only states that the ALJ considered the listing of impairments and offers nothing to reveal *why* the ALJ made his or her determination. *Fox v. Colvin*, 632 F. App'x 750, 755 (4th Cir. 2015) ("Our circuit precedent makes clear that it is not our role to speculate as to how the ALJ applied the law to its findings or to hypothesize the ALJ's justifications that would perhaps find support in the record."). Likewise, it is generally unacceptable for an ALJ to summarily conclude that a claimant does not have an impairment or combination of impairments that meets a listing; the ALJ's decision must include a discussion that applies the pertinent legal requirements of the listing to the record evidence. *Radford*,

734 F.3d at 295. When evidence exists that a claimant meets a disability listing, but the evidence is rejected without discussion, "'insufficient legal analysis makes it impossible for a reviewing court to evaluate whether substantial evidence supports the ALJ's findings.'" *Coe v. Berryhill,* No. 1:15CV1077, 2017 WL 886858, at *3 (M.D.N.C. Mar. 6, 2017) (quoting *Bailey v. Colvin,* No. 1:14CV303, 2015 WL 5227646, at *3 (M.D.N.C. Sept. 8, 2015)). While an "ALJ is not required to explicitly identify and discuss every possible listing", the ALJ "is compelled to provide a coherent basis for [the] Step Three determination." *Ezzell*, 688 F. App'x at 200 (citation omitted).

In *Radford*, the Fourth Circuit found that an ALJ's step three analysis was "devoid of reasoning" and the ALJ's summary conclusion that the claimant did not meet a listing made is impossible for a reviewing court to evaluate whether substantial evidence supported the ALJ's findings. *Radford*, 734 F.3d at 295. However, the Fourth Circuit noted that a full explanation by the ALJ was particularly important in Radford's case because the medical record included a fair amount of evidence supportive of his claim; in fact, the record contained five years of medical examinations and probative evidence strongly suggesting that Radford met or equaled the relevant listing. *Id.* Similarly, in *Fox*, the Fourth Circuit found that the ALJ failed to explain the step three finding despite inconsistent evidence in the file, including a treating physician's numerous statements about the claimant's severe limitations, which possibly supported a finding that the claimant met the relevant listing. *Fox*, 632 F. App'x at 755 (4th Cir. 2015).

Despite the admonitions of the Fourth Circuit in *Radford* and *Fox* regarding an ALJ's duty of explanation at step three, "if the ALJ's opinion read as a whole provides substantial evidence to support the ALJ's decision at step three, such evidence may

provide a basis for upholding the ALJ's determination." *McDaniel v. Colvin*, No. 2:14-CV-28157, 2016 WL 1271509, at *4 (S.D.W. Va. Mar. 31, 2016) (quoting *Smith v. Astrue*, 457 Fed. Appx. 326, 328 (4th Cir. 2011) ("Reading the ALJ's decision as a whole, substantial evidence supports the finding at step three of the sequential evaluation process as the ALJ's analysis at subsequent steps of the evaluation are inconsistent with meeting [the listing].")). Indeed, "the ALJ need only review medical evidence once in his opinion." *Id.* at *4 (quoting *McCartney v. Apfel*, 28 Fed. Appx. 277, 279 (4th Cir. 2002)). Ultimately, "[a] cursory explanation in step three is satisfactory so long as the decision as a whole demonstrates that the ALJ considered the relevant evidence of record and there is substantial evidence to support the conclusion." *Id.* (citing *Smith*, 457 Fed. Appx. at 328). Simply put, the written decision must demonstrate that the ALJ adequately performed all of the key tasks required by the sequential disability evaluation process. When the record includes conflicting evidence, or facts suggesting that the claimant might meet a listing, the ALJ's discussion is particularly important. Yet, "[i]f the court need not look beyond the ALJ's opinion to find substantial evidence supporting the ALJ's step-three determination, the ALJ's decision may be affirmed." *Marcum v. Berryhill*, No. CV 16-2297, 2017 WL 1095068, at *4 (S.D.W. Va. Mar. 23, 2017).

At issue in this case is Listing 4.04C - Coronary Artery Disease, which states:

Coronary artery disease, demonstrated by angiography (obtained independent of Social Security disability evaluation) or other appropriate medically acceptable imaging, and in the absence of a timely exercise tolerance test or a timely normal drug-induced stress test, an MC, preferably one experienced in the care of patients with cardiovascular disease, has concluded that performance of exercise tolerance testing would present a significant risk to the individual, with both 1 and 2:
1. Angiographic evidence showing:

a. 50 percent or more narrowing of a nonbypassed left main coronary artery; or

b. 70 percent or more narrowing of another nonbypassed coronary artery; or

c. 50 percent or more narrowing involving a long (greater than 1 cm) segment of a nonbypassed coronary artery; or

d. 50 percent or more narrowing of at least two nonbypassed coronary arteries; or

e. 70 percent or more narrowing of a bypass graft vessel; and

2. Resulting in very serious limitations in the ability to independently initiate, sustain, or complete activities of daily living.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, 4.04C.

The ALJ found at step two of the sequential evaluation that Claimant's rheumatic mitral valve disease, status post valvuloplasty, and coronary artery disease, status post stenting, were severe impairments. (Tr. at 953). At step three, the ALJ stated that Claimant's cardiac impairments were best evaluated under section 4.04 of the Listing. As relevant to the present matter, the ALJ simply stated that Claimant did not meet Listing 4.04C because her "coronary artery disease was not of the "severity required" of the listing. (*Id.*). In the subsequent RFC discussion, the ALJ reviewed Claimant's cardiac treatment, noting that Claimant underwent successful heart catheterization with the placement of two stents in May 2010; however, he failed to mention that the interoperative findings included significant stenosis (60 to 70 percent) in Claimant's left anterior descending artery at diagonal branch 1 and in her circumflex artery (66 percent), as well as diffuse (30 to 40 percent) stenosis in the remainder of the left anterior descending artery. (Tr. at 957). The ALJ stated that Claimant saw Dr. Karam in August 2010 and her EKG was normal. (*Id.*). The ALJ further stated that there was no indication that Claimant followed up with Dr. Karam after August 2010, and, although her condition worsened in 2012 and Claimant suffered a heart attack and required additional heart stents, the evidence showed that

during the relevant period ending in December 2010 that Claimant's "cardiac treatment was successful and she experienced no significant cardiac symptoms." (*Id.*). The ALJ noted that, contrary to the ALJ's prior assertion, the evidence submitted to the Appeals Council did indeed reflect ongoing treatment with Dr. Karam during 2010; however, the ALJ stated that Claimant's treatment was "entirely conservative and her condition seem[ed] to be stable." (Tr. at 958). As for Dr. Besen's opinion that Claimant met Listing 4.04C in 2012, the ALJ gave the opinion little weight because Dr. Besen "did not indicate any of the restrictions related prior to 2012." (*Id.*).

Reviewing the record in this matter, the ALJ's conclusory statement that Claimant's coronary artery disease did not meet the severity required by Listing 4.04C is devoid of reasoning and precludes meaningful review of the step three determination. In *Brown*, a claimant likewise argued that an ALJ's finding that the claimant's heart condition did not meet Listing 4.04C violated *Radford* because the ALJ did not explain the step three finding, and the claimant argued that the district court inappropriately "min[ed] facts from the medical record to support the ALJ's decision" instead of remanding the matter to the ALJ. *Brown v. Colvin*, 639 F. App'x 921, 922 (4th Cir. 2016). In that case, the ALJ had stated simply that the medical evidence did not establish objective findings that would meet or equal the listing, and the step three finding was consistent with the state agency opinion that considered listing 4.04. *Id.* at 923. The Fourth Circuit rejected the Commissioner's argument that, unlike *Radford*, the medical record clearly established that the claimant's heart condition did not meet or equal Listing 4.04C. The Fourth Circuit concluded that the "medical record in this matter is not so one-sided that one could clearly decide, without analysis, that Listing 4.04C is not implicated." *Id.* The Fourth Circuit stated that it did

26

"not accept invitations to review the medical record de novo to discover facts to support or refute the ALJ's finding at Step Three, and it was error for the district court to do so." *Id.* Instead, the Fourth Circuit remanded the matter "to avoid engaging in fact-finding 'in the first instance' and to allow the ALJ to further develop the record so that we can conduct a meaningful judicial review in the event the case returns to us." *Id.* (quoting *Radford,* 734 F.3d at 296).

Similar to *Brown*, the record in this case is not so one-sided that Listing 4.04C is not implicated. In fact, the ALJ omitted important details of Claimant's May and August 2010 records that appear to be directly relevant to Listing 4.04C. In May 2010, Claimant had 60 to 70 percent stenosis in the diagonal 1 branch of her left anterior descending artery and 66 percent stenosis in her circumflex artery. (Tr. at 639). Drug-eluting stents were placed in both arteries. (*Id.*). As indicated above, Listing 4.04C can be satisfied by either 70 percent or more narrowing of a non-bypassed coronary artery or 50 percent or more narrowing of at least two non-bypassed coronary arteries, which result in very serious limitation in the ability to independently initiate, sustain, or complete activities of daily living. Although the evidence of Claimant's severe stenosis in her coronary arteries during the relevant period factored into the analysis of Listing 4.04C, the ALJ did not discuss, reconcile, or even mention such evidence. The ALJ later mentioned that stents were placed in Claimant's diagonal branch and circumflex arteries in 2010, and the ALJ stated that, "[f]urthermore," Claimant's daily activities were not markedly limited, as Claimant went to the hairdresser, church, and shopping; did laundry; and performed personal care. (Tr. at 957-58). However, although such explanation might have related to his analysis of Listing 4.04C, the ALJ did not connect such evidence in a way to his step three finding, and the Court could only speculate as

to how the ALJ reconciled the evidence and determined that Claimant did not meet the listing. The law is clear in this circuit that a district court cannot piece together the evidence or independently find support from the record to affirm an ALJ's step three determination that an implicated listing was not met when the ALJ failed to provide such explanation in the first place. The Court "cannot begin to engage in a 'meaningful review' when there is nothing on which to base a review." *Fox*, 632 F. App'x at 755.

Furthermore, as Claimant notes, Dr. Besen's opinion that Claimant did not meet Listing 4.04C until 2012 did not consider the evidence from Claimant's treating cardiologist, Dr. Karam, during the relevant period. While the evidence from Dr. Karam may not have altered Dr. Besen's conclusion that Claimant did not meet Listing 4.04C until 2012, it certainly may have changed his opinion. Therefore, it was inappropriate for the ALJ to give little weight to Dr. Besen's opinion that Claimant met Listing 4.04C because Dr. Besen "did not indicate any of the restrictions related prior to 2012" when Dr. Besen was not given the opportunity to review important evidence from Dr. Karam relating to the relevant period.

Therefore, because the ALJ's step three determination lacks adequate explanation to allow for meaningful review, the undersigned **FINDS** that the decision is not supported by substantial evidence and the matter must again be remanded so that the ALJ can reconsider or elaborate upon the step three finding regarding Listing 4.04.

### B. SSR 83-20

Given the fact that the undersigned recommends that the matter be remanded, the undersigned only briefly discusses the other arguments raised by Claimant. Claimant contends that the ALJ failed to comply with SSR 83-20, which "state(s) the

policy and describe(s) the relevant evidence to be considered when establishing the onset date of disability." SSR 83-20, 1983 WL 31249, at *1. In *Bird*, the Fourth Circuit noted that the ALJ found that the claimant did not prove that he had a disabling impairment before his date last insured, but the ALJ did not make a finding regarding whether the claimant was ever disabled after his date last insured. *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 345 (4th Cir. 2012). The Fourth Circuit stated that because the ALJ's finding that the claimant did not establish a disabling condition before his date last insured "was a conclusion reached after the ALJ's commission of two errors of law in evaluating the evidence," the ALJ must review the evidence on remand to determine if the claimant was disabled at any time. *Id.* Then, if the ALJ determined that the claimant established disability, but the medical evidence of the date of onset of that disability was ambiguous such that a retrospective inference to the period before the Claimant's date last insured would be necessary, the ALJ would be required to obtain the assistance of a medical advisor in order to render an informed determination regarding the date of onset. *Id.* Therefore, in the present matter, the ALJ should comply with SSR 83-20 and *Bird* on remand to the extent it is applicable. For instance, Dr. Besen determined that Claimant met Listing 4.04C in 2012. While the ALJ is not obligated to accept such finding, the undersigned **FINDS** that the ALJ should consider all relevant evidence on remand to determine whether Claimant was disabled at any time and the ALJ should follow the mandates of SSR 83-20 and *Bird* accordingly.

### C. Combination of Impairments

Claimant further argues that the ALJ failed to consider whether her cardiac conditions in combination with her fibromyalgia would medically equal Listing 4.04.

(ECF No. 11 at 14). An ALJ must consider the combined, synergistic effect of all of a claimant's medically determinable impairments, severe and non-severe, to accurately evaluate the extent of their resulting limitations on the claimant. *Walker v. Bowen*, 889 F.2d 47 (4th Cir. 1989).  The regulation provides:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.

20 C.F.R. § 404.1523.  Where there is a combination of impairments, the issue "is not only the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's ability to engage in substantial gainful activity." *Oppenheim v. Finch*, 495 F.2d 396, 398 (4th Cir. 1974). The ailments should not be fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity.  *Id.* The cumulative or synergistic effect that the various impairments have on claimant's ability to work must be analyzed. *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983). As the United States Court of Appeals for the Fourth Circuit stated in *Walker,* "[i]t is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together, is to render claimant unable to engage in substantial gainful activity." *Walker,* 889 F.2d at 50.

Claimant' argument focuses on step three of the sequential evaluation. If the claimant is unable to demonstrate that his impairments, alone or in combination, match the criteria of a particular listed impairment, the claimant may still establish disability by showing that his impairments are medically equivalent to the listed

impairment.

To establish medical equivalency, a claimant must present evidence that his impairment, unlisted impairment, or combination of impairments, is equal in severity and duration to all of the criteria of a specific listed impairment. 20 C.F.R. § 404.1526. The SSA sets out three ways in which medical equivalency can be determined. First, if the claimant has an impairment that is described in the Listing, but (1) does not exhibit all of the findings specified in the listing, or (2) exhibits all of the findings, but does not meet the severity level outlined for each and every finding, equivalency can be established if the claimant has other findings related to the impairment that are at least of equal medical significance to the required criteria. *Id.* § 404.1526(b)(1). Second, if the claimant's impairment is not described in the Listing, equivalency can be established by showing that the findings related to the claimant's impairment are at least of equal medical significance to those of a closely analogous listed impairment. *Id.* § 404.1526(b)(2). Finally, if the claimant has a combination of impairments, no one of which meets a listing, equivalency can be proven by comparing the claimant's findings to the most closely analogous listings; if the findings are of at least equal medical significance to the criteria contained in any one of the listings, then the combination of impairments will be considered equivalent to the most similar listing. *Id.* § 404.1526(b)(3). "For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment ... A claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment."

*Sullivan v. Zebley*, 493 U.S. 521, 531 (1990). As discussed, the claimant bears the burden of production and proof at this step of the sequential evaluation. *Grant*, 699 F.2d at 191.

In this case, the ALJ stated that he considered Claimant's fibromyalgia at step three and concluded that it did not medically equal a listing or combine with other impairments to equal a listing. (Tr. at 954). However, as noted, the ALJ analysis of Listing 4.04 was inadequate, and the matter must be remanded for the ALJ's to elaborate upon or reconsider his analysis of the listing. Thus, the undersigned **FINDS** that, on remand, the ALJ must again consider the individual and combined effects of Claimant's impairments in accordance with the applicable law outlined above.

## VIII.  <u>Recommendations for Disposition</u>

For the above reasons, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **GRANT** Plaintiff's request for judgment on the pleadings, to the extent that it requests remand, (ECF No. 11); **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 12); and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Irene C. Berger, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if mailed) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the

"Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Berger, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:**  July 25, 2019

Cheryl A. Eifert
United States Magistrate Judge